810 F.2d 580
 55 USLW 2480, 22 Fed. R. Evid. Serv. 682,
13 Media L. Rep. 2049
 In re GRAND JURY PROCEEDINGS.
STORER COMMUNICATIONS, INC., and Bradley M. Stone,
Petitioners-Appellants,
v.
Wayne County Circuit Court Judge William J. GIOVAN; Wayne
County Prosecuting Attorney John D. O'Hair; and
Wayne County Sheriff Robert Ficano,
Respondents- Appellees.
 No. 86-1787.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 1, 1986.
Decided Feb. 6, 1987.
 
 Robert W. Powell, Henry W. Saad (argued), Zan M. Nicolli, Dickinson, Wright, Moon, Van Dusen and Freeman, Detroit, Mich., for petitioners-appellants.
 Patrick Foley, Wayne Co. Pros. Atty., Don W. Atkins (argued), Detroit, Mich., for respondents-appellees.
 Before WELLFORD, GUY and NORRIS, Circuit Judges.
 ALAN E. NORRIS, Circuit Judge.
 
 
 1
 Petitioner Bradley Stone, a television reporter, appeals from the district court's denial of a writ of habeas corpus. The writ had been sought on the ground that Stone would be held in custody in violation of the United States Constitution if an order of a Michigan court, holding him in contempt for failing to comply with a subpoena from a county grand jury to give evidence, were enforced as scheduled. The first question raised by the appeal is whether Stone was entitled to a privilege under the first amendment to the United States Constitution to withhold information sought by a grand jury. In addition, we are asked to determine whether he was denied equal protection of the laws, in violation of the fourteenth amendment, in view of the determination by Michigan courts that the Michigan legislature failed to include reporters for broadcast media within the coverage of a statute[1] which provides that communications between newspaper reporters and their informants are privileged and confidential.
 
 
 2
 Stone was found in contempt by the Wayne County Circuit Court, as the result of his failure to comply with a subpoena duces tecum issued by the grand jury and directing him to produce video tapes compiled in the course of his reporting on the activities of Detroit youth gangs. The video tapes were sought, for identification purposes, in connection with an investigation into the murder of a state police officer, allegedly at the hands of two gang members who may have been present during Stone's filming of the "Be Like Boys" or "Be Light Gang" in July 1985, one month before the slaying.
 
 
 3
 Stone urged the state courts to set aside the subpoena and, later, the contempt judgment, on the state ground that, as a matter of statutory construction, he should be included within the class of news reporters entitled to claim the statutory "shield," and upon the federal grounds that, under the first amendment,[2] he possessed a qualified "federal common law" privilege to refrain from disclosing the information, and that to deny him the benefit of the statute was to deny him equal protection of the laws as contemplated by the fourteenth amendment.[3] Having been unsuccessful in the trial court and upon appeal to the Michigan Court of Appeals and the Michigan Supreme Court, Stone and his employer, Storer Communications, Inc., sought a writ of habeas corpus in the United States District Court for the Eastern District of Michigan, on the federal grounds. It appears that appellant exhausted his remedies in the state courts of Michigan, as required by 28 U.S.C. Sec. 2254(b), in view of his having presented those courts with a fair opportunity to rule on his federal claims; there was no avenue for review of the federal constitutional contentions remaining in the state court system when he filed for a writ of habeas corpus. See, e.g., Anderson v. Harless, 459 U.S. 4, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982); County Court of Ulster County v. Allen, 442 U.S. 140, 149 n. 7, 99 S.Ct. 2213, 2220 n. 7, 60 L.Ed.2d 777 (1979); Picard v. Connor, 404 U.S. 270, 278, 92 S.Ct. 509, 513, 30 L.Ed.2d 438 (1971); Mathews v. Marshall, 754 F.2d 158 (6th Cir.1985), rev'd on other grounds sub nom. Morris v. Mathews, --- U.S. ----, 106 S.Ct. 1032, 89 L.Ed.2d 187 (1986). The district court dismissed Storer Communications as a party since it was not threatened by state custody, and agreeing with the state courts that "no violation of the First or Fourteenth Amendments was committed" denied the writ.
 
 I.
 
 4
 Stone went to Hart Plaza in downtown Detroit on July 12, 1985, with the hope of encountering members of the gang. When he observed some, he began filming them, but discontinued after it became apparent that the film taken would be of little use. About thirty to sixty seconds of film was taken during this initial interval. In an effort to obtain candid shots of gang members and to conduct on-camera interviews about their activities, he asked them to enter an isolated area of the Hart Plaza, away from the public. As a condition of filming, Stone agreed not to broadcast or disclose to anyone the portion of the film already taken, in which the faces of gang members could be seen.[4] He also promised to do all future filming in the silhouette. There were, reportedly, certain threats directed at Stone that, if he aired the film showing their faces, he would be subjected to bodily harm.
 
 
 5
 Later, realizing that he did not have enough film to fill out that gang's episode of the television series, Stone returned to Hart Plaza on July 19, by prearrangement with some of the gang's members. On this occasion, he again encountered members of the gang, but filmed only those portions of their bodies below the neck. Stone indicated that all but a few seconds of the July 19 footage was used in the television broadcast series, which was aired on five successive evenings beginning July 29, 1985.
 
 
 6
 Several of the gang's members later revealed to the police detective investigating the murder that, on July 12, when the initial filming occurred, the assailants of the murdered police officer were present. One gang member furnished police with the identity of the youth who shot the trooper. However, because their informant will not testify, police are unable to proceed without further evidence. Several eyewitnesses told investigators that they could identify the assailants if provided with photographs. Not only is a photograph of the triggerman not available, but, most significantly, he has altered his appearance so that a current photograph or line-up would likely not lead to an identification. Accordingly, investigators contend the film would be the most reliable means for identification.
 
 
 7
 On September 27, 1985, grand jury subpoenas were served on Stone's employer for an appearance on October 3. A motion to quash the subpoena was filed by Storer Broadcasting. The trial court heard arguments on that motion, and the testimony of the investigating detective and Stone in closed session. On January 27, 1986, the court filed a lengthy decision denying the motion to quash. The trial judge determined that Michigan's statutory news reporters' privilege does not include television news reporters, and ruled that Stone had no constitutional privilege to refuse to divulge to the grand jury the material sought. In response to Stone's continuing refusal to relinquish the subpoenaed material, the trial judge found him in civil contempt, and further ordered that he be confined in the custody of the Sheriff of Wayne County until such time as he either complied with the subpoena, or until expiration of the term of the grand jury on January 9, 1987. Appellant was released from custody pursuant to an order of this court, staying enforcement of the contempt order pending final disposition of this appeal.
 
 II.
 
 8
 In contending that, as a news reporter, he was entitled to assert a "privilege grounded in the First Amendment," Stone would have us restructure the holding of the Supreme Court in Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), since the majority opinion in that case rejected the existence of such a first amendment testimonial privilege:
 
 
 9
 Until now the only testimonial privilege for unofficial witnesses that is rooted in the Federal Constitution is the Fifth Amendment privilege against compelled self-incrimination. We are asked to create another by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy. This we decline to do. Fair and effective law enforcement aimed at providing security for the person and property of the individual is a fundamental function of government, and the grand jury plays an important, constitutionally mandated role in this process.... [W]e perceive no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the consequential, but uncertain, burden on news gathering that is said to result from insisting that reporters, like other citizens, respond to relevant questions put to them in the course of a valid grand jury investigation or criminal trial.
 
 
 10
 [T]he Constitution does not, as it never has, exempt the newsman from performing the citizen's normal duty of appearing and furnishing information relevant to the grand jury's task.
 
 
 11
 408 U.S. at 689-91, 92 S.Ct. at 2661-62 (footnote omitted).
 
 
 12
 Stone insists, however, that when his reading of Justice Powell's concurring opinion is superimposed upon Justice White's majority decision, the government is required to make "a clear and convincing showing of relevancy, essentiality, and exhaustion of non-media sources" for obtaining the information before he can be compelled to testify. In arguing that this amounts to a "qualified privilege," Stone relies heavily upon the dissenting opinion of three justices in Branzburg, and upon opinions from other circuit courts.
 
 
 13
 Because we conclude that acceptance of the position urged upon us by Stone would be tantamount to our substituting, as the holding of Branzburg, the dissent written by Justice Stewart (joined by Justices Brennan and Marshall) for the majority opinion, we must reject that position.
 
 
 14
 Justice White, writing for himself, Chief Justice Burger, and Justices Blackmun, Powell and Rehnquist, in addition to declining to recognize the existence of a first amendment reporter's "testimonial privilege that other citizens do not enjoy" [408 U.S. at 690, 92 S.Ct. at 2661], specifically dealt with, and rejected, the claim that newsmen are entitled to a "conditional, not absolute" privilege--a testimonial privilege conditioned upon the inability of prosecutors to establish relevancy, unavailability from other sources, and a need so compelling as to override invasion of first amendment interests occasioned by the disclosure. 408 U.S. at 680, 92 S.Ct. at 2656. The conditional privilege rejected in Branzburg has, in essence, been resurrected in this case by Stone as his claimed qualified privilege. In the course of spurning the conditional privilege, the Supreme Court discussed at great length the difficulties of administering such a privilege [408 U.S. at 702-08, 92 S.Ct. at 2667-70] and the policy reasons which argue against its recognition. 408 U.S. at 690-702, 92 S.Ct. at 2661-68.
 
 
 15
 Justice Stewart deplored the majority's rejection of "any newsman's privilege" [408 U.S. at 744, 92 S.Ct. at 2681], and stated his position that:
 
 
 16
 I would hold that the government must (1) show that there is probable cause to believe that the newsman has information that is clearly relevant to a specific probable violation of law, (2) demonstrate that the information sought cannot be obtained by alternative means less destructive of First Amendment rights; and (3) demonstrate a compelling and overriding interest in the information.
 
 
 17
 408 U.S. at 743, 92 S.Ct. at 2681.
 
 
 18
 It is interesting to note the majority's reference to the warnings of Professor John Henry Wigmore and other commentators against obstructing the search for truth by the creation of additional testimonial privileges.[5] In his 1940 treatise on evidence, Professor Wigmore suggested "four fundamental conditions" as predicates to recognition of any privilege against disclosure of communications: (1) the communications must originate in a confidence that they will not be disclosed; (2) confidentiality must be essential to the maintenance of the relationship between the parties; (3) the relationship must be one which, in the opinion of the community, ought to be fostered; and (4) the injury that would inure to the relationship by the disclosure of the communications must be greater than the benefit thereby gained for the correct disposal of litigation. 8 J. Wigmore, A Treatise on the Anglo-American System of Evidence Sec. 2286 (J. McNaughton rev. ed. 1940). It is apparent, from the extensive discussion in the majority opinion of policy reasons urged upon it as supporting adoption of a reporter's testimonial privilege, that, in the judgment of the majority, the last three of Professor Wigmore's predicates are lacking. 408 U.S. at 691-708, 92 S.Ct. at 2661-70.
 
 
 19
 Accordingly, we decline to join some other circuit courts, to the extent that they have stated their contrary belief that those predicates do exist, and have thereupon adopted the qualified privilege balancing process urged by the three Branzburg dissenters and rejected by the majority.[6] Generally, these circuits indicate that their positions are based, at least in part, upon that portion of Justice Powell's concurring opinion where it is said that:
 
 
 20
 The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions.
 
 
 21
 In short, the courts will be available to newsmen under circumstances where legitimate First Amendment interests require protection.
 
 
 22
 408 U.S. at 710, 92 S.Ct. at 2671 (footnote omitted).
 
 
 23
 That portion of Justice Powell's opinion certainly does not warrant the rewriting of the majority opinion to grant a first amendment testimonial privilege to news reporters, especially when the quoted language is considered in the context of that language which precedes it:
 
 
 24
 As indicated in the concluding portion of the opinion, the Court states that no harassment of newsmen will be tolerated. If a newsman believes that the grand jury investigation is not being conducted in good faith he is not without remedy. Indeed, if the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source relationships without a legitimate need of law enforcement, he will have access to the Court on a motion to quash and an appropriate protective order may be entered.
 
 
 25
 408 U.S. at 709-10, 92 S.Ct. at 2671.
 
 
 26
 Justice Powell was alluding to this language from the majority opinion:
 
 
 27
 [N]ews gathering is not without its First Amendment protections, and grand jury investigations if instituted or conducted other than in good faith, would pose wholly different issues for resolution under the First Amendment. Official harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources would have no justification. Grand juries are subject to judicial control and subpoenas to motions to quash. We do not expect courts will forget that grand juries must operate within the limits of the First Amendment as well as the Fifth.
 
 
 28
 408 U.S. at 707-08, 92 S.Ct. at 2670.
 
 
 29
 It is readily apparent, then, that Justice Powell's concurring opinion is entirely consistent with the majority opinion, and neither limits nor expands upon its holding, but that, instead, it responds to what Justice Powell perceived as an unwarranted characterization of that holding by Justice Stewart.
 
 
 30
 Perhaps Justice Powell's use of the term "privilege" has provided too great a temptation for those inclined to disagree with the majority opinion. In the sense that the balancing referred to by Justice Powell, when instigated by a reporter seeking to protect a confidential source, may result in the denial to a party of the use of evidence which is reliable, one is reminded of the invocation of a "privilege," as contrasted with an "exclusion" which prohibits the introduction of evidence which is unreliable or calculated to mislead or prejudice. But, this balancing of interests should not then be elevated on the basis of semantical confusion, to the status of a first amendment constitutional privilege.[7] Instead, courts should, as did the Michigan state courts, follow the admonition of the majority in Branzburg to make certain that the proper balance is struck between freedom of the press and the obligation of all citizens to give relevant testimony, by determining whether the reporter is being harassed in order to disrupt his relationship with confidential news sources, whether the grand jury's investigation is being conducted in good faith, whether the information sought bears more than a remote and tenuous relationship to the subject of the investigation, and whether a legitimate law enforcement need will be served by forced disclosure of the confidential source relationship. Here, the state trial court understood the admonition and made the factual determinations and struck the balance called for by the majority opinion in Branzburg, in its well-reasoned order and decision filed in response to the motion to quash the subpoena.
 
 
 31
 We also note that, under the circumstances of this case, the public's interest in effective law enforcement is so compelling that, even if we were to accept Stone's argument, the balancing test he urges would result in a decision for disclosure, since the government succeeded in making a clear and convincing showing that he has information that is clearly relevant to a specific violation of criminal law, that the information is not available from alternative sources, and that the state has a compelling and overriding interest in obtaining the information. Consequently, even if we were convinced of the existence of the qualified testimonial privilege claimed by Stone, his claim of privilege would fail under the facts of this case.
 
 
 32
 We conclude, therefore, that the district court correctly dismissed Stone's claim that his custody would be in violation of the first amendment to the United States Constitution.
 
 III.
 
 33
 We now turn to Stone's contention that the district court erred in denying him habeas corpus relief because the conduct of state courts in holding that he was not entitled to the benefit of a Michigan statutory privilege against revealing communications between news reporters and their sources had the effect of denying him equal protection of state laws, as guaranteed by the fourteenth amendment. He does not seek a declaration that the statute should be voided under the Constitution; instead, he asks that we vacate the contempt judgment against him by determining that the state of Michigan has denied him equal protection of its laws, and that we then remand the matter to the Michigan state courts to determine the manner of correcting the violation--either by invalidating the statute, thus denying the privilege to any news reporters, or by expanding the statute to include broadcast news reporters. All this, obviously, turns on an initial determination of whether Stone was denied equal protection of the laws. Since the construction of the language of a state statute is the prerogative of that state's courts, and Michigan courts have construed the language of the statute as not including appellant within its coverage, the proper construction to be given the statute has been settled.
 
 
 34
 In assessing Stone's equal protection claim, the district court determined that "the right not to present evidence before the grand jury is not a fundamental right" and found it unnecessary to apply a strict scrutiny test to the statute as construed by Michigan courts. The court went on to find that the distinction drawn by the Michigan state legislature between reporters for print media and for broadcast media is rationally related to a legitimate government purpose.
 
 
 35
 Stone tenders two bases for his contention that the Michigan newspaper reporters' shield law violates the Equal Protection Clause. First, he argues that a distinction between reporters working in print media and those employed by broadcasters bears no reasonable relationship to any legitimate state objective, and that the classification is therefore arbitrary and denies him equal protection of the laws. Second, he argues that, since newspaper reporters can invoke the testimonial privilege to protect confidential news sources when testifying, it is patently arbitrary to deny this same privilege to television and radio news reporters who may have obtained identical information in an interview with the same confidential source as the newspaper reporter, simply because they happen to report news through the medium of broadcasting. Stone's view is that, because rights intertwined with freedom of the press--gathering and disseminating news--are involved, there is a narrower scope for the operation of the presumption of constitutionality than would ordinarily attach to state legislation challenged in this manner.
 
 
 36
 Strict judicial scrutiny of a legislative classification is required only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class. Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976). Clearly, Stone does not belong to a suspect class. See San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 28, 93 S.Ct. 1278, 1293, 36 L.Ed.2d 16 (1973). In addition, we reject his contention that the statute interferes with a basic, fundamental right, in view of the holding of the Supreme Court in Branzburg that the first amendment accords no privilege to news reporters against appearing before a grand jury and answering questions relative to a criminal investigation, since requiring reporters to appear and testify before state and federal grand juries does not impact unconstitutionally upon their ability to gather news. Consequently, a statute which grants newspaper reporters a privilege against grand jury testimony, and fails to mention broadcast media reporters, cannot be said to interfere with a fundamental right of broadcast media reporters.
 
 
 37
 Since such a heightened level of judicial scrutiny is not required, the statute is to be analyzed under the rational basis standard. Murgia, 427 U.S. at 312, 96 S.Ct. at 2566. "This inquiry employs a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one. Perfection in making the necessary classifications is neither possible nor necessary. Such action by a legislature is presumed to be valid." Id. at 314, 96 S.Ct. at 2567 (citation omitted). We have said previously that "state legislatures are presumed by federal courts to have acted constitutionally in making laws." Hartford Fire Insurance Co. v. Lawrence, Dykes, Goodenberger, Bower & Clancy, 740 F.2d 1362, 1366 (6th Cir.1984). "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970) [quoting McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961) ]. If a legislative classification "rationally furthers the purpose identified by the State," it does not violate the Equal Protection Clause. Murgia, 427 U.S. at 314, 96 S.Ct. at 2567; Darks v. City of Cincinnati, 745 F.2d 1040, 1042-43 (6th Cir.1984). The burden of showing that a classification is unreasonable is upon the party challenging the statute.
 
 
 38
 Stone contends that the statute is unreasonable because it utilizes an underinclusive classification in the sense that it excludes some persons who are similarly situated with the persons who are included, when one considers that the purpose of the law is to protect a news reporter's confidential communications with his news sources from grand jury scrutiny.
 
 
 39
 That Stone's argument, when made in the context of this case, is not well-taken, is clear from principles reviewed by the Supreme Court in Katzenbach v. Morgan, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966):
 
 
 40
 [I]n deciding the constitutional propriety of the limitations in such a reform measure we are guided by the familiar principles that a "statute is not invalid under the Constitution because it might have gone farther than it did," Roschen v. Ward, 279 US 337, 339, 73 L ed 722, 49 S Ct 336, that a legislature need not "strike at all evils at the same time," Semler v Dental Examiners, 294 US 608, 610, 79 L ed 1086, 1089, 55 S Ct 570, and that "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind," Williamson v Lee Optical Co. 348 US 483, 489, 99 L ed 563, 573, 75 S Ct 461.
 
 
 41
 Id. at 657, 86 S.Ct. at 1727.
 
 
 42
 A legislature need not run the risk of losing an entire remedial scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked. See Ozan Lumber Co. v. Union County National Bank, 207 U.S. 251, 252, 28 S.Ct. 89, 90, 52 L.Ed. 195 (1907). Some play must be allowed for the joints of the legislative machine to operate. Missouri, K & T Ry. v. May, 194 U.S. 267, 270, 24 S.Ct. 638, 639, 48 L.Ed. 971 (1904). A state legislature may implement its program of reform by gradually adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations, without having to convince the courts of the correctness of their legislative judgments so long as the challenged regulation, at least debatably, is based on rational considerations. See Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981).
 
 
 43
 The trial court noted that the shield statute was one of five amendments to the grand jury statutes, the immediate objective of which was to curb excesses in the use of the so-called "one-man" grand jury, the form of grand jury inquiry commonly in use in Michigan during that era. Such an effort at legislative reform is a rational basis for the adoption of a statute which, in taking aim at a specific excess, creates a classification by failing to address all potential excesses. In addition, the specific circumstances of this case supply a conceivable basis for a distinction being made between print and television reporters, since the visual identification evidence sought by the grand jury is peculiar to the television medium.
 
 
 44
 Because Stone has failed to demonstrate that the Michigan legislature's decision to limit the shield to print reporters was irrational, the statute meets the requirement of the Equal Protection Clause, that the classification rationally relate to a legitimate government purpose.
 
 
 45
 Accordingly, we conclude that the district court did not err in denying a writ of habeas corpus in this case. The judgment of the district court is affirmed, and our stay of the Michigan trial court's contempt order is dissolved.
 
 
 46
 RALPH B. GUY, Jr., Circuit Judge, concurring.
 
 
 47
 Although I concur in Judge Norris's opinion, I write separately to emphasize one point and to make an additional one. The point I think bears emphasis in this case is that even if one applies the precise balancing test that the dissent in Branzburg advocated, the result of that balancing commands disclosure under these circumstances. I reiterate this point because it relates to the fact that this matter is here on a habeas petition, a fact which the plaintiff has ignored in the presentation of this case before the court. Accordingly, the plaintiff must live with the specific federal statutory habeas procedures as well as the judicial gloss thereon. For example, the state court made many important factual findings which are significant to any balancing to be performed. We are now bound by these findings since plaintiff has not argued that any of the eight exceptions found in 28 U.S.C. Sec. 2254(d) apply. Plaintiff has, or at least had, an opportunity to appeal from the state court's decision on these issues unburdened by the strictures which surround habeas proceedings.
 
 
 48
 Also and perhaps of more significance is that I retain considerable doubt as to whether this case presents a fact situation which is even within the purview of federal habeas review. 28 U.S.C. Sec. 2254 reads in pertinent part: "[A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody ... only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." Generally, in habeas cases the constitutional right is clearly established, and the only question is whether the person in custody falls within the protection of the defined right. Such is not the case here. Branzburg holds there is no constitutional protection. The Court stated:
 
 
 49
 Until now the only testimonial privilege for unofficial witnesses that is rooted in the Federal Constitution is the Fifth Amendment privilege against compelled self incrimination. We are asked to create another by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy. This we decline to do.
 
 
 50
 Branzburg, 408 U.S. at 689-90, 92 S.Ct. at 2661 (emphasis added). The majority goes on to state: "We are unwilling to embark the judiciary on a long and difficult journey to such an uncertain destination. The administration of a constitutional newsman's privilege would present practical and conceptual difficulties of a high order." Id. at 703-04, 92 S.Ct. at 2668. It is conceivable that the grand jury "privilege" which newspersons have, at least that stemming from Branzburg, is nothing more than an acknowledgement of the fact that the judiciary can control abuses in an instrumentality under its control, i.e., the grand jury. Support for this proposition is found in the last paragraph of the majority opinion where it is stated: "Official harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources would have no justification. Grand juries are subject to judicial control and subpoenas to motions to quash." Id. at 707-08, 92 S.Ct. at 2670 (emphasis added).
 
 
 51
 As indicated, supra, the plaintiffs can seek to pursue their state substantive appeal to the United States Supreme Court. There is a real question here as to whether they seek review of substantive issues decided adversely to them by the Michigan Supreme Court under the guise of a habeas petition. This they cannot do. Monk v. Blackburn, 605 F.2d 837 (5th Cir.1979), cert. denied, 445 U.S. 933, 100 S.Ct. 1326, 63 L.Ed.2d 768 (1980).
 
 
 
 [1]
 In any inquiry authorized by this act communications between reporters of newspapers or other publications and their informants are hereby declared to be privileged and confidential. Any communications between attorneys and their clients, between clergymen and the members of their respective churches, and between physicians and their patients are hereby declared to be privileged and confidential when such communications were necessary to enable such attorneys, clergymen, or physicians to serve as such attorney, clergyman, or physician
 Mich.Comp.Laws Ann. Sec. 767.5a (West 1982)
 
 
 [2]
 "Congress shall make no law ... abridging the freedom ... of the press...." U.S. Const. amend. I
 
 
 [3]
 "Section 1.... No state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV
 
 
 [4]
 There may be a question in this case whether Stone could assert a privilege to avoid disclosing the unedited video tapes of the gang members, since the film may not be a "communication" in the technical sense of the word. In addition, the critical portion of the film sought, which had not been published, may not have been taken under circumstances warranting a claim of confidentiality. Apparently, the promise of confidentiality was extended subsequent to the filming, which was conducted in a public place and under circumstances where any privacy concerns of the subjects would be eviscerated if they were crowding around and waving for the attention of the camera operator. However, we do not address those questions, as they were not raised below and their resolution would require factual determinations
 
 
 [5]
 Branzburg v. Hayes, 408 U.S. 665, at 690 n. 29, 92 S.Ct. 2646, 2661 n. 29, 33 L.Ed.2d 626 (1972)
 
 
 [6]
 See, e.g., Zerilli v. Smith, 656 F.2d 705 (D.C.Cir.1981) (qualified privilege available under some circumstances in civil litigation, since Branzburg does not control in civil cases); United States v. Burke, 700 F.2d 70 (2d Cir.), cert. denied, 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983) (reporters qualified privilege in criminal, as well as civil cases, conditioned upon "clear and specific showing" that the information sought is highly material and relevant, is necessary or critical to the claim, and is not obtainable from other available sources); United States v. Cuthbertson, 630 F.2d 139 (3d Cir.1980), cert. denied, 454 U.S. 1056, 102 S.Ct. 604, 70 L.Ed.2d 594 (1981) (journalists have a federal common law qualified privilege, in both civil and criminal cases, to refuse to divulge their sources); LaRouch v. National Broadcasting Co., 780 F.2d 1134 (4th Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 79, 93 L.Ed.2d 34 (1986) (whether journalist's privilege will protect source depends upon whether the information sought is relevant, can be obtained by alternate means, and is the subject of a compelling interest); Miller v. Transamerican Press, Inc., 621 F.2d 721 (5th Cir.1980), cert. denied, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981) (reporter has first grndment privilege which protects refusal to disclose identity of confidential informants, although privilege is not absolute)
 
 
 [7]
 See Bruno & Stillman, Inc. v. Globe Newspaper Co., 224 Ct.Cl. 583, 633 F.2d 583 (1st Cir.1980)