**In re Denis LETELLIER.**

Supreme Judicial Court of Maine.

Argued June 14, 1990.

Decided July 20, 1990.

---

John M.R. Paterson (orally) and Patricia A. Peard, Portland, Bernstein, Shur, Sawyer & Nelson, for appellants.

Jonathan S. Piper (orally), Preti, Flaherty, Beliveau & Pachios, Portland, for amici curiae.

Mary Tousignant (orally), Dist. Atty., Alfred, for appellee.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN, CLIFFORD, COLLINS and BRODY, JJ.

McKUSICK, Chief Justice.

Does a television news reporter have a constitutional privilege to refuse to comply with a grand jury subpoena commanding him to turn over the unbroadcast portions of a videotaped, nonconfidential interview given him by a public official under criminal investigation for official misconduct? In the fact circumstances presented by this case, we conclude that he does not. We therefore affirm the judgment of the Superior Court (York County, *Bradford, J.*) denying reporter John Impemba's motion to quash the grand jury subpoena and ordering him and his employer, Maine Radio and Television Company (WCSH–TV), to produce before the grand jury the complete videotape of an interview given Impemba by Denis Letellier on February 21, 1990.

Denis Letellier is one of the three elected members of the Police Commission of the City of Biddeford. In early 1990 the District Attorney's office in York County, assisted by the Attorney General's office, was investigating allegations that Letellier had misused his official position and influence to fix criminal charges against his son Kevin for operating a motor vehicle while under the influence of intoxicating liquor and after his license had been suspended. In response to these allegations and the ongoing investigation, WCSH–TV on February 21, 1990, sent Impemba to Biddeford to interview Letellier. That interview, con-

ducted on the campus of the University of New England where Letellier works, was videotaped. Impemba also videotaped interviews with other city officials, including another elected member of the Police Commission and the Biddeford mayor who serves ex officio as a member of the Commission. Using that videotape footage, WCSH–TV produced three separate news stories about the Letellier investigation, which it aired in a total of seven news broadcasts.[1] The three stories contain in the aggregate about 45 seconds of the Letellier interview, in the course of which Letellier made inculpatory statements concerning his attempts to get criminal charges against his son reduced or dropped.

After the broadcasts, the District Attorney asked Impemba and WCSH–TV to provide her with the entire videotape of the Letellier interview for the purpose of showing the full recorded interview to the grand jury. In response, WCSH–TV turned over to the District Attorney a videotape copy of the three separate news stories in the form they were broadcast, but refused to turn over the parts of the videotaped Letellier interview that WCSH–TV had edited out in the process of preparing the news stories. The portions cut from the videotape in editing are called out-takes.

On the District Attorney's motion and with WCSH–TV's consent, the Superior Court (*Brodrick, J.*) ordered WCSH–TV to preserve the entire videotape of the Letellier interview. Shortly thereafter, the District Attorney caused a subpoena duces tecum to be issued commanding Impemba to appear before the grand jury and to bring with him the entire videotape of the Letellier interview. Impemba promptly moved to quash the subpoena.

At the hearing on the motion to quash,[2] the District Attorney emphasized that she

---

1. Transcripts of the three news stories as broadcast are set forth in Appendix A to this opinion. The first story aired three times with minor variations during news broadcasts at 6:00 p.m. and 11:00 p.m. and 6:30 a.m. on February 21 and 22, 1990. The second story was broadcast

at noon on February 22, and the third aired three times with minor variations at 6:00 p.m. and 11:00 p.m. and 6:30 a.m. on February 22 and 23, 1990.

2. The subject of the ongoing criminal investigation, *Denis Letellier*, appeared at the hearing

seeks only the out-takes of the Letellier interview and does not seek any reporter notes, any out-takes from other interviews, or any other information. Following the hearing, the Superior Court held that the Letellier out-takes did not enjoy a constitutional privilege from compulsory process before the grand jury and denied the motion to quash the subpoena. Impemba and WCSH–TV immediately appealed.[3]

## I.

In Maine no person has a privilege to refuse to be a witness except as "provided by Constitution or statute or by [the Maine Rules of Evidence] or other rules promulgated by the Supreme Judicial Court." M.R.Evid. 501. Neither the Maine Rules of Evidence nor the Maine statutes provide any reporter privilege.[4] Therefore, the only possible source of the privilege asserted by Impemba and WCSH–TV is constitutional, under either the free press clause of the federal First Amendment made applicable to the states by the Fourteenth Amendment or the parallel provision of the Maine Constitution. *See* U.S. Const. amend. I; Me. Const. art. I, § 4.

The controlling case addressing reporter privilege under the United States Constitution is *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). In *Branzburg*, a divided United States Supreme Court held that a reporter has no constitutional privilege to refuse to disclose confidential news sources to a grand jury. The Court ruled:

> Until now the only testimonial privilege for unofficial witnesses that is rooted in the Federal Constitution is the Fifth Amendment privilege against compelled self-incrimination. We are asked to create another by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy. This we decline to do. Fair and effective law enforcement aimed at providing security for the person and property of the individual is a fundamental function of government, and the grand jury plays an important, constitutionally mandated role in this process. On the records now before us, we perceive no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the consequential, but uncertain, burden on news gathering that is said to result from insisting that reporters, like other citizens, respond to relevant questions put to them in the course of a valid grand jury investigation or criminal trial.

408 U.S. at 689–91, 92 S.Ct. at 2661. Justice Powell, casting the critical fifth vote to make the *Branzburg* majority, concurred separately to respond to concerns raised in the *Branzburg* dissents. He concluded:

> The asserted claim to privilege should be judged on its facts by the striking of a

through counsel. The court ruled, however, that Letellier lacked standing on the issues raised by the motion to quash. Letellier has not appealed to challenge that ruling.

3. We granted leave to WGME–TV, the National Association of Broadcasters, the Maine Press Association, the Maine Association of Broadcasters, Dudman Communications, Inc., and the Maine Daily Newspaper Publishers Association to file joint briefs as amici curiae and to participate at oral argument. We also granted the appellants' motion for an expedited hearing.

4. Twenty-six states have enacted so-called reporter shield laws that in varying degree protect reporters in their news gathering function. Although a reporter shield statute has been proposed in the Maine legislature from time to time, none has been enacted. *See* Comment, *Developments in the News Media Privilege: The Qualified Constitutional Approach Becoming Common Law,* 33 Me.L.Rev. 401, 412–15 (1981). *See also* Field & Murray, *Maine Evidence* § 505.1, at 144 (1987) ("Apart from the highly doubtful area of a constitutional privilege under the First Amendment, newsmen will have no privilege unless the Legislature enacts one"). It is significant that, even in certain of those states with reporter shield statutes, Impemba and WCSH–TV would not be protected from compelled production of the out-takes since the source was nonconfidential. *See, e.g.,* R.I.Gen. Laws §§ 9–19.1–1 to 9–19.1–3 (1985) ("no person shall be required by any court, grand jury, agency, department or commission of the state ... to disclose any confidential information or to disclose the source of any confidential information received or obtained by him in his capacity as a reporter"). *See also* L. Tribe, *American Constitutional Law* 975 (2d ed. 1988).

proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions.

In short, the courts will be available to newsmen under circumstances where legitimate First Amendment interests require protection.

408 U.S. at 710, 92 S.Ct. at 2671 (*Powell, J.,* concurring) (footnote omitted).

Some federal circuit court decisions have inferred from the language of Justice Powell's concurrence and the opinions of the *Branzburg* dissenters [5] that reporters have a qualified privilege to refuse to testify in legal proceedings. *See LaRouche v. National Broadcasting Co.,* 780 F.2d 1134, 1139 (4th Cir.), *cert. denied,* 479 U.S. 818, 107 S.Ct. 79, 93 L.Ed.2d 34 (1986); *United States v. Burke,* 700 F.2d 70, 77 (2d Cir.), *cert. denied,* 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983); *Zerilli v. Smith,* 656 F.2d 705 (D.C.Cir.1981); *Miller v. Transamerican Press, Inc.,* 621 F.2d 721 (5th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981); *Silkwood v. Kerr–McGee Corp.,* 563 F.2d 433, 438 (10th Cir.1977); *Cervantes v. Time,*

*Inc.,* 464 F.2d 986 (8th Cir.1972), *cert. denied,* 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973).[6] *See also United States v. Cuthbertson,* 630 F.2d 139, 147 (3d Cir.1980), *cert. denied,* 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981) (journalists possess qualified privilege arising under federal common law to withhold unpublished information in criminal cases). In determining whether a reporter's privilege applied in each particular case, these courts have generally followed the test, advocated by three dissenters in *Branzburg,* that:

> when a reporter is asked to appear before a grand jury and reveal confidences, ... the government must (1) show that there is probable cause to believe that the newsman has information that is clearly relevant to a specific probable violation of law; (2) demonstrate that the information sought cannot be obtained by alternative means less destructive of First Amendment rights; and (3) demonstrate a compelling and overriding interest in the information.

408 U.S. at 743, 92 S.Ct. at 2681 (*Stewart, J.,* dissenting) (footnotes omitted).

Those circuit court cases, however, fail to convince us that *Branzburg* mandates any such rigid "three-pronged" analysis.[7] In

---

**5.** Justice Douglas alone on the Supreme Court would have recognized a reporter's absolute privilege arising from the First Amendment. *See Branzburg v. Hayes,* 408 U.S. 665, 711, 92 S.Ct. 2646, 2686, 33 L.Ed.2d 626 (1972) (*Douglas, J.,* dissenting). When we hereafter speak of the *Branzburg* dissenters, we refer to the three dissenters for whom Justice Stewart wrote. *See id.* at 725, 92 S.Ct. at 2694.

**6.** By contrast to these circuit court cases, the Sixth Circuit reads *Branzburg* as refusing to "interpret[ ] the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy." *In re Grand Jury Proceedings,* 810 F.2d 580, 583 (6th Cir.1987) (quoting *Branzburg,* 408 U.S. at 690, 92 S.Ct. at 2661). The Sixth Circuit declined to join those federal courts that have "adopted the qualified privilege balancing process urged by the three *Branzburg* dissenters and rejected by the majority," *id.,* 810 F.2d at 584, preferring to "follow the admonition of the majority in *Branzburg* to make certain that the proper balance is struck between freedom of the press and the obligation of all citizens to give relevant testimony, by determin-

ing whether the reporter is being harassed ..., whether the grand jury's investigation is being conducted in good faith, whether the information sought bears more than a remote and tenuous relationship to the subject of the investigation, and whether a legitimate law enforcement need will be served by forced disclosure of the confidential source relationship." *Id.* at 586.

**7.** In each of these cases, the federal circuit court was asked to compel the disclosure of confidential information or sources, a circumstance not present in the case at bar. Also, most of the controversies arose in civil actions where the balancing of interests is arguably different than in criminal actions. *See, e.g., Zerilli v. Smith,* 656 F.2d 705, 711 (D.C.Cir.1981) (*Branzburg* not controlling in civil litigation). Further, several of the opinions specifically cited the balancing language of the *Branzburg* majority and nonetheless proceeded with the three-pronged analysis, apparently as a convenient tool to facilitate that balancing. *See United States v. Burke,* 700 F.2d 70, 77 (2d Cir.), *cert. denied,* 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983); *LaRouche v. National Broadcasting Co.,* 780 F.2d 1134, 1139

writing his concurrence in *Branzburg*, Justice Powell was obviously aware of the test advocated by the dissenters and obviously rejected it. Justice Powell reiterated on several occasions post-*Branzburg* that the appropriate method of analyzing requests for information from a news gatherer is for the court to balance the competing constitutional and societal interests on a case-by-case basis. *See, e.g., Herbert v. Lando*, 441 U.S. 153, 180, 99 S.Ct. 1635, 1650–51, 60 L.Ed.2d 115 (1979) (*Powell, J.*, concurring); *Zurcher v. Stanford Daily*, 436 U.S. 547, 570, 98 S.Ct. 1970, 1984, 56 L.Ed.2d 525 (1978) (*Powell, J.*, concurring). By urging that we recognize the "privilege" label and adopt the three-pronged test, Impemba and WCSH–TV would have us restructure the *Branzburg* Court and rewrite its holding. This we decline to do.

The approach that finds direct support in the language of the *Branzburg* majority and the critical concurrence by Justice Powell calls for the court to strike "a proper balance" on a case-by-case basis "between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct." *Branzburg v. Hayes*, 408 U.S. at 710, 92 S.Ct. at 2671 (*Powell, J.*, concurring). The wisdom of this approach is confirmed by the relevant decisions of the United States Court of Appeals for our own First Circuit. Eschewing the "privilege" label in favor of a flexible balancing test, the First Circuit has declared:

> Whether or not the process of taking First Amendment concerns into consideration can be said to represent recognition by the Court of a "conditional", or "limited" privilege is, we think, largely a question of semantics.... [C]ourts must balance the potential harm to the free flow of information that might result against the asserted need for the requested information.

(4th Cir.), *cert. denied*, 479 U.S. 818, 107 S.Ct. 79, 93 L.Ed.2d 34 (1986); *Zerilli v. Smith*, 656 F.2d at 712. Ironically, several of the courts that seemed most receptive to recognizing a reporter's privilege ultimately ordered the production of the allegedly privileged materials upon analysis of the interests involved and the

*Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 595–96 (1st Cir.1980) (footnotes omitted). *Accord United States v. LaRouche Campaign*, 841 F.2d 1176, 1182 (1st Cir.1988) (legitimate First Amendment concerns "must be balanced" against other interests). The First Circuit has "deliberately refrain[ed] from further categorizing with any precision what inquiries should be made by the court or in what sequence. The task is one that demands sensitivity, invites flexibility, and defies formula." *Bruno & Stillman, Inc.*, 633 F.2d at 598. In cases involving federal constitutional issues on which the Supreme Court has not spoken definitively or unambiguously, the relevant decisions rendered by the United States Court of Appeals for the circuit within which the State of Maine is located are particularly persuasive with us, and we will follow them "so far as is reasonably possible." *State v. Gardner*, 509 A.2d 1160, 1163 (Me.1986) (interpreting what constitutes custody for purpose of invoking the federal *Miranda* rule). *See also Littlefield v. State Dept. of Human Services*, 480 A.2d 731, 737 (Me.1984); *Commonwealth v. Negri*, 419 Pa. 117, 122, 213 A.2d 670, 672 (1965).

◼ The First Amendment thus requires that we balance the competing societal and constitutional interests on a case-by-case basis, weighing any possible injury to the free flow of information against the recognized obligation of all citizens to give relevant evidence regarding criminal conduct. Although Impemba and WCSH–TV point to the Maine as well as the United States Constitution as the source of their asserted privilege, we can find no basis in language or history to differentiate a claim of privilege under the Maine Constitution from a claim of privilege advanced under the First Amendment. Just as the First Amendment prohibits the making of any law "abridging the freedom ... of the press," article I, section 4, of the Maine Constitution pro-

specific facts of the individual case. *See, e.g., United States v. Cuthbertson*, 630 F.2d 139, 148 (3d Cir.1980), *cert. denied*, 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981); *Miller v. Transamerican Press, Inc.*, 621 F.2d 721, 726 (5th Cir.1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981).

vides that "no laws shall be passed regulating or restraining the freedom of the press." By using the term "regulating or restraining" rather than "abridging," the Maine Constitution does not make its protection of freedom of the press any more or less absolute or any more or less extensiv, than the constitutional protection accorded that freedom under the First Amendment. And Maine's free press clause does not have any distinguishing history. Maine's Constitutional Convention of 1819 patterned our Declaration of Rights after the Declaration of Rights of the Massachusetts Constitution of 1780, under which Maine was governed for 40 years prior to statehood. *See* R. Banks, *Maine Becomes a State* 153–54 (1970). The Massachusetts Declaration of Rights states that the "liberty of the press ... ought not ... to be restrained." Mass. Const. Pt. I, art. XVI. The Massachusetts Supreme Judicial Court has specifically stated that "we see no reason to construe our State Constitution [in respect to a claimed reporter's privilege] more broadly than the Supreme Court has construed the First Amendment." *Commonwealth v. Corsetti*, 387 Mass. 1, 4, 438 N.E.2d 805, 808 (1982). *See also First Nat'l Bank of Boston v. Attorney General*, 371 Mass. 773, 792, 359 N.E.2d 1262, 1274 (1977), *rev'd on other grounds sub nom. First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). Thus, both the language and the history of Maine's free press clause lead us to perform the same analytical balancing on a case-by-case basis under the State Constitution that the Supreme Court requires us to perform under the First Amendment.

## II.

Having identified the proper method of analyzing the appellants' claim of constitutional privilege, we now proceed to make that analysis.[8] At the outset, we must define in general the scope of the public

interest implicated in freedom of the press. "The constitutional guarantee of a free press 'assures the maintenance of our political system and an open society' ... and secures 'the paramount public interest in a free flow of information to the people concerning public officials.'" *Pell v. Procunier*, 417 U.S. 817, 832, 94 S.Ct. 2800, 2809, 41 L.Ed.2d 495 (1974) (citations omitted). The protection of the First Amendment extends beyond the freedom to print or broadcast; it also guarantees freedom in the news gathering and editorial processes. *See, e.g., Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576, 100 S.Ct. 2814, 2827, 65 L.Ed.2d 973 (1980) (First Amendment protection of news gathering); *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 258, 94 S.Ct. 2831, 2839–40, 41 L.Ed.2d 730 (1974) (First Amendment protection for editorial process). These general and abstract public interests, however, are not what are to be weighed in the balance against "the obligation of all citizens to give relevant testimony with respect to criminal conduct." *Branzburg v. Hayes*, 408 U.S. at 710, 92 S.Ct. at 2671 (*Powell, J.,* concurring). Rather, it is the potential *injury* or *impairment* of the protected news gathering and editorial processes on the facts of the particular case in litigation that must be balanced against the demonstrated need in that particular case for evidence possessed by the reporter.

■ Turning now to the case at bar, we find no doubt that the balance of the competing constitutional and societal interests on the facts of the Letellier out-takes weighs decidedly on the side of disclosure. The First Amendment rights involved here will not be significantly impaired by the compelled production of the videotape of the full Letellier interview. Unlike the confidential sources about whom the dissenters in *Branzburg* expressed concern, Letellier is a publicly identified, nonconfidential source who voluntarily responded to a news reporter's questions. The interest of

---

**8.** Since the basic facts in this case are not in dispute, this appeal from the Superior Court's denial of the claim by Impemba and WCSH–TV of a First Amendment privilege raises a pure question of law, appropriate to be decided by us

without remand for further factfindings. *Cf. State v. Cloutier*, 544 A.2d 1277, 1280 (Me.1988) (a trial judge's Fourth Amendment ruling based on uncontroverted facts is independently reviewable on appeal).

WCSH–TV and its reporter in nondisclosure of nonconfidential information it elected not to broadcast is much weaker here than where disclosure is sought from or about a confidential source. As the First Circuit said in *United States v. LaRouche Campaign*, 841 F.2d at 1181, "[w]hen there is no confidential source or information at stake, the identification of First Amendment interests is a more elusive task." *See also State v. Hohler*, 543 A.2d 364, 366 (Me.1988) (no "qualified privilege for a reporter not to testify concerning nonconfidential, published information obtained from an identified source").

The videotape of the Letellier interview has been preserved and, since that videotape is all the District Attorney seeks, the subpoena in this case does not represent any generalized "fishing expedition" through the files of a news gatherer. Neither will this subpoena interfere in any significant way with WCSH–TV's news operations. At most, Impemba might be called as a witness to authenticate the tape. This poses a very limited burden on WCSH–TV and its reporter. Furthermore, as in *Branzburg*, the subpoena served on Impemba involves "no prior restraint or restriction on what the press may publish, and no express or implied command that the press publish what it prefers to withhold." *Branzburg v. Hayes*, 408 U.S. at 681, 92 S.Ct. at 2657.

Appellants argue that the possibility that journalists in the future may be required to produce unpublished, nonconfidential materials before a grand jury will inhibit future news sources from coming forward with news and will cause reporters to write and record less. They make their "chill" argument in the broad generality and do not tie it down to the specific facts of this case. They do not persuade us that the prospect of the enforcement of subpoenas for out-takes from videotaped interviews in future situations like the Letellier case will cast any significant chill upon future news sources or news gatherers. Nor do they persuade us that the disclosure of the Letellier out-takes interferes in any improper way with WCSH–TV's editorial processes or will chill those processes in similar situations in the future. Although, as the First Circuit has said, unlimited or unthinking allowance of access to a news gatherer's files "will impinge upon First Amendment rights," *Bruno & Stillman, Inc.*, 633 F.2d at 595, that is not the type of access at issue in this case. The District Attorney's request is both limited and focused; seeking only the videotape of an interview voluntarily given by a public figure who never requested that the news reporter maintain any degree of confidentiality. We are in the same position as the First Circuit was in *United States v. LaRouche Campaign*, 841 F.2d at 1181, when it stated:

> We have been referred to no authoritative sources demonstrating or explaining how any chilling effect could result from the disclosure of statements made for publication without any expectation of confidentiality.

Any news source or news gatherer in Maine who might in the future be deterred from participating in a similar television interview because of the possibility that out-takes from the interview will be disclosed to a grand jury could only be assured nondisclosure by our recognizing an absolute privilege for reporters, a position that no court has adopted and that no one advocates in this case. *See Branzburg v. Hayes*, 408 U.S. at 702–03, 92 S.Ct. at 2667–68.

The countervailing public interests in favor of disclosure are plentiful and compelling. The videotape out-takes will be viewed by the grand jury, a unique body guaranteed by both the United States and the Maine Constitutions to play an historically vital role in our criminal justice system. *See* U.S. Const. amend. V; Me. Const. art. I, § 7. A grand jury serves "the dual function of determining if there is probable cause to believe that a crime has been committed and of protecting citizens against unfounded criminal prosecutions." *Branzburg v. Hayes*, 408 U.S. at 686–87, 92 S.Ct. at 2659–60. For it to perform its fundamental role in law enforcement and for it at the same time to serve as the guardian of the rights of the innocent, a grand jury necessarily requires

broad investigative powers. *Id.* at 700–01, 92 S.Ct. at 2666–67.

For the grand jury in this case, the Letellier videotape is a "unique bit[ ] of evidence ... frozen at a particular place and time" containing information that is plainly unobtainable from any other source. *See United States v. Cuthbertson,* 630 F.2d at 148. Even if Letellier were willing to talk to the officials investigating the allegations against him—as we understand he now is not—he could not himself duplicate exactly what he said to Impemba, or how he said it. *A fortiori,* even if a bystander overheard the interview—and there is no suggestion that such a bystander exists—the bystander would not be in any full sense an alternative source of the information recorded on the videotape. Moreover, because the grand jury already has available the broadcast portions of the Letellier interview and those public portions contain inculpatory statements, the out-takes become that much more important because they and they alone will permit the grand jury to assess the full context in which Letellier made his videotaped statements. The videotape presents an invaluable and irreplaceable opportunity for the grand jury to observe Letellier's demeanor and to hear an unedited version of his story in his own words with any subtle nuance that it may reveal. The grand jury can then draw its own inferences and conclusions and thereby can effectively and completely discharge the weighty obligation it owes to both Letellier and the people of the State of Maine. WCSH–TV generated an even greater need for the grand jury to have the unedited videotape by extensively paraphrasing Letellier's comments during its broadcast reports on the Letellier investigation.[9] The out-takes may reveal shades of meaning different from WCSH–TV's paraphrase and may therefore be at least partially exculpatory. They may also contain further inculpatory admissions. In any event, it is essential that the grand jury have access to the full videotape, if only for context. Otherwise, exclusive power is vested in WCSH–TV to decide how much it will allow the public, as well as the prosecuting attorney and the grand jury, to know about what Letellier said or did not say.

The public interest in the disclosure of the Letellier videotape is made particularly pressing by the circumstances of its creation. The videotape records the interview of an elected municipal official who, in talking with a news reporter, voluntarily made nonconfidential statements about an ongoing criminal investigation into his alleged abuse of a public office. The investigation focuses on the public official's alleged interference with the prosecution of serious criminal charges against his son.[10] The alleged criminal action by the police commissioner constitutes corruption of the law enforcement process, a matter of grave public concern striking at the heart of public confidence and trust in government. Obviously, all the statements made by Letellier on the subject are highly relevant to the grand jury's investigation. There is no suggestion whatever that the District Attorney, in making her very limited request for the Letellier out-takes alone, is overreaching in any way or is motivated by bad faith, politics, or an intent to harass.[11]

---

**9.** Introducing the first Letellier story, the WCSH–TV news co-anchor stated that Letellier "admits he is using his elected position to protect his son from a drunk driving charge and other motor vehicle violations." Impemba then began his report by stating that "Police Commissioner Denis Letellier says he has used his power to influence how police treat his son Kevin, who has been arrested numerous times for motor vehicle violations." Impemba later said that "Letellier ... freely admits using his power to help his son and he said he might consider doing it again." *See* Appendix A to this opinion.

**10.** The broadcast stories report that Letellier's son had been arrested for operating a motor vehicle while under the influence of intoxicating liquor and after his license had been suspended. The stories suggest not only that Letellier arranged to have charges against his son dropped, but that police files were tampered with or destroyed.

**11.** The *Branzburg* Court clearly stated that a grand jury investigation "instituted or conducted other than in good faith, would pose wholly different issues for resolution under the First Amendment" and that subpoenas attempting to harass the press "would have no justification." *Branzburg v. Hayes,* 408 U.S. at 707–08, 92 S.Ct. at 2670. Any subpoena duces tecum issued under Rule 17(c) of the Federal Rules of Criminal

Thus, when on the present factual situation we strike a balance between the vital constitutional and societal interests on a case-by-case basis as we are instructed to do by *Branzburg*, it is clear that the Superior Court properly refused in the "limited and unique circumstances of this case" to quash the subpoena for the Letellier videotape out-takes. Furthermore, it is significant to note that in any event the test articulated by the *Branzburg* dissenters and here urged by the appellants would lead us to no different result. Application of the mechanical three-pronged test still requires disclosure of the out-takes, given the compelling facts of this case. Here the State has indeed demonstrated, in full compliance with the dissenters' test, that 1) the Letellier out-takes contain "information that is clearly relevant to a specific probable violation of law," 2) "the information sought cannot be obtained by alternative means less destructive of First Amendment rights," and 3) the grand jury has a "compelling and overriding interest in the information" in order to perform its constitutionally guaranteed function in a complete and effective manner. *Branzburg v. Hayes*, 408 U.S. at 743, 92 S.Ct. at 2681 (*Stewart, J.*, dissenting).

In conclusion, the facts of this case make the answer to the appellants' claim of constitutional privilege very easy. The public interest in the integrity of the Biddeford police and city officials and in the effectiveness of the York County grand jury proceedings far outweighs any discernible impairment that the required production of the nonconfidential Letellier videotape out-takes might conceivably cause to the First Amendment interests asserted by Impemba and WCSH–TV. The importance of the constitutional protections of a free press, however, leads us to state again that our decision today is limited to the particular fact circumstances of this case.

The entry is:

Procedure must comply with the "good faith" requirement, *see United States v. Nixon*, 418 U.S. 683, 699–700, 94 S.Ct. 3090, 3103, 41 L.Ed.2d 1039 (1974), as must the subpoena for the Letellier videotape issued under M.R.Crim.P. 17(c).

Judgment affirmed.

All concurring.

### APPENDIX A

Transcripts of Broadcasts by WCSH–TV on February 21–23, 1990 relating to the Letellier Investigation

**News Story I** (*broadcast at 6:00 p.m. and again with minor modifications at 11:00 p.m. February 21, 1990, and at 6:30 a.m. February 22, 1990*)

*In the studio:*

PAT CALLAGHAN: Good evening, everyone. NewsCenter has learned that the state Attorney General is investigating allegations of influence peddling by a police commissioner in Biddeford.

CINDY WILLIAMS: The commissioner admits he is using his elected position to protect his son from a drunk driving charge and other motor vehicle violations. NewsCenter's John Impemba joins us now with more on this story. John.

JOHN IMPEMBA: Well, Cindy, Police Commissioner Denis Letellier says he has used his power to influence how police treat his son Kevin, who has been arrested numerous times for motor vehicle violations. The commissioner reportedly asked a police officer to drop a drunk driving charge and at least one other serious motor vehicle charge against his son. The charges were dropped or changed because some police officers say they fear the commissioner's power.

*Interview Scene:*

DENIS LETELLIER: ... my son's down the police station, he calls me up at home, and—"Dad, I'm down at the police station. Can you come down and help me out."
[*Voice-over by Impemba*] Letellier, a maintenance worker at University of New England, freely admits using his power to help his son and he says he might consider doing it again. [*End voice-over*]

IMPEMBA: Where does it stop?

LETELLIER: That's a good question.

IMPEMBA: What if your son is arrested for larceny? Would it stop there, too? Would you try to get that charge reduced? Or would that be a matter of parent-police relationship? Where does it stop?

LETELLIER: I don't know where it stops. That's a good question.

*On the street*

IMPEMBA: There's no telling how long the Attorney General will continue to investigate all these allegations of impropriety, but the one question many people want answered is, why does this police commissioner believe his son shouldn't get the same treatment as everyone else in · this city?

*Interview Scene:*

LETELLIER: Yes, I do see something wrong with it. I'm not going to say there's nothing wrong. I agree with you there's something wrong and this shouldn't happen. But it does happen.

*On the street:*

IMPEMBA: But the Biddeford mayor says otherwise.

MAYOR BONITA BELANGER: It's totally unacceptable in the City of Biddeford that anyone in any office use their position to influence any department to change whatever has to be done.

*Interview Scene:*

LETELLIER: You know, I can see if, you know, if I did it for Joe Schmuck and Joe Schmuck gave me ten bucks or whatever. Gee, you know, I'd be the rottenest—and I'd agree with you.

IMPEMBA: How do we know that hasn't happened?

LETELLIER: You can investigate me all you want. I mean—exactly.

IMPEMBA: ... yeah ...

LETELLIER: ... I'm not saying that, you know, I'm clean and all that.

*In the studio:*

IMPEMBA: Some say Letellier is also responsible for poor morale in the police department because he's been trying to make changes there that have been angering the police union. Ironically, Letellier was a Biddeford police officer for about 15 years before he quit and ran for police commissioner two years ago.

WILLIAMS: Okay, John. Thank you very much.

\*    \*    \*    \*    \*    \*

**News Story II** (*broadcast at noon, February 22, 1990*)

ANNOUNCER: Live, Rob Caldwell, Peggy Kaiser with the weather, and the NewsCenter team. This is NewsCenter at Noon.

*In the studio:*

ROB CALDWELL: Good afternoon, everyone. A Biddeford police commissioner reportedly may resign his elected post if a state investigation turns up any evidence of criminal wrongdoing on his part. Last night NewsCenter reported that the state Attorney General is investigating allegations that police commissioner Denis Letellier pulled strings to get several motor vehicle charges against his son dropped or changed. NewsCenter's John Impemba is in our newsroom now with more to this story. John.

IMPEMBA: Rob, a source told me this morning that the state investigation into improprieties by police commissioner Denis Letellier should be wrapped up by the first of the week, then it will be up to the State and the York County District Attorney's office to decide whether to take this case forward and present it to a grand jury for a possible indictment. [*Voice-over interview scene*] The State is investigating whether Letellier used his power as police commissioner to get a drunk driving charge against his son Kevin dropped in 1988. The investigation is also focusing on why a driving after suspension charge against his son by Biddeford police was changed to a lesser charge of driving without a license. Letellier also freely admits he used his influence when we talked with him yesterday using a wireless microphone. [*End voice-over*]

*Interview Scene:*

LETELLIER: —But I did it because it was my son. And that's the only person that I'll do it for. I'll do it for my wife or my son or my mother or something like that. But for a total person that I don't know—you or a friend,—no I wouldn't do it.

*In the studio:*

IMPEMBA: When Letellier's son was arrested for drunk driving in 1988 he was also charged with driving after suspension. That charge was never brought forward because the arrest record disappeared from police headquarters. A source tells me that the State is also looking into whether Letellier had something to do with this. Rob.

CALDWELL: John, a lot of people aren't that familiar with the position of police commissioner. What exactly does a police commissioner do in Biddeford.

IMPEMBA: Rob, there are three police commissioners in Biddeford. A fourth member is the mayor of Biddeford. They are all part-time positions, but they wield a lot of power. They technically are the supervisor for the police chief and they can approve the hiring and the firing of police officers. That's why there's a lot of concern here that Letellier may have used his influence in an intimidating way against some of the police officers.

ROB CALDWELL: Okay. Thank you very much, John Impemba.

\*     \*     \*     \*     \*     \*

**News Story III** (*broadcast at 6:00 p.m. and again with minor modifications at 11:00 p.m. February 22, 1990, and at 6:30 a.m. February 23, 1990*)

CINDY WILLIAMS: Good evening, everyone. State investigators want to find out what happened to some arrest records as they continue looking into possible wrongdoings by a Biddeford police commissioner.

ROB CALDWELL: *Last night* NewsCenter reported exclusively that the Attorney General is investigating allegations that police commissioner Denis Letellier pulled strings to get several motor vehicle charges against his son dropped. News-

Center's John Impemba broke the story. He was back in Biddeford today and he has more on the missing records.

*[Biddeford scenes in background]*

IMPEMBA: State investigators want to know why some arrest records involving the son of police commissioner Denis Letellier are missing from the Biddeford police department. In 1988 Letellier's son Kevin was arrested for drunk driving and operating after suspension. The drunk driving charge never hit the courts and the arrest record of the second motor vehicle charge disappeared. [*Voice-over interview scene*] Investigators want to know if Letellier had anything to do with the missing records, considering that he's admitting using his influence several times, most recently in December when he had another motor vehicle charge dropped against his son. [*End voice-over*]

*Interview Scene:*

LETELLIER: I don't think it's right for me to do it. But I did it because it was my son. And that's the only person that I'll do it for. I'll do it for my wife or my son or my mother or something like that. But for a total person that I don't know—you or a friend—no, I wouldn't do it.

*On the street:*

IMPEMBA: The police commission works only part-time and they average only about 6 hours a month of work. But they do hold what some say is a tremendous amount of power in this city. And the state investigation into one member has some city officials thinking that this form of government is just too old-fashioned.

MAYOR: There are enough safeguards, quite frankly, in place that I feel the police commission at this point in time is probably a vestige of the old way of doing business.

*INTERVIEW WITH ROBERT LADDERBUSH:*

IMPEMBA: Another police commissioner who's been on the board more than a decade says he's never heard of any other influence peddling.

LADDERBUSH: ... but we don't do this as a practice. I get called in for some

cases sometimes which there is a problem. Then we handle the problem as it goes along.

IMPEMBA: But you don't use influence to . . .

LADDERBUSH: No.

*Voice-over interview scene:*

IMPEMBA: The state investigation wraps up next week. In Biddeford, John Impemba, NewsCenter.

*In the studio:*

CALDWELL: NewsCenter has also learned that Letellier may resign if the state finds any evidence of wrongdoing on his part.