919 F.2d 739
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Susan STINEMETZ; Annette Abernathy; Vicki Hamilton; Pam
McCain; Cathy Owens; and Richard Shelton,
Plaintiffs-Appellants.
v.
Ned MCWHERTER, Governor; David Manning, Commissioner of
Finance and Administration; and Don Holt,
Commissioner of Personnel, Defendants-Appellees.
 No. 90-5145.
 United States Court of Appeals, Sixth Circuit.
 Dec. 10, 1990.
 
 Before NATHANTEL R. JONES, RYAN and BOGGS, Circuit Judges.
 PER CURIAM.
 
 
 1
 Plaintiffs in this action for equal pay appeal the district court's dismissal of their equal protection claims and dismissal without prejudice of their claims under the Tennessee constitution and other state laws. For the reasons set forth below, we affirm.
 
 I.
 
 2
 On December 7, 1988, plaintiff-appellants, a group of teachers employed by the State of Tennessee in the Department of Mental Health/Mental Retardation ("DMH/MR"), brought this action against the Governor and the Commissioners of Personnel and Finance and Administration of Tennessee. The complaint alleged violations of the equal protection, the contracts and the just compensation clauses of the United States Constitution as well as constitutional and statutory violations under Tennessee law. Jurisdiction was invoked pursuant to 28 U.S.C. Secs. 1341 and 1343 and 42 U.S.C. Secs. 1983 and 1988 and pendant jurisdiction was invoked on the state claims. A motion was filed to certify a class action but the motion was not ruled on.
 
 
 3
 The gravamen of plaintiffs' complaint is that the Tennessee constitution, taken along with the civil service laws, creates a right to equal pay for persons in the same job classification or performing the same duties. The plaintiffs assert that teachers employed in DMH/MR and in the Department of Human Services ("DHS") were paid substantially less than teachers employed in the Department of Correction ("DOC") or in the special schools under the direction of the Department of Education ("DOE"). The complaint sought declaratory and injunctive relief as well as backpay.
 
 
 4
 On January 17, 1989, defendants filed a Motion to Dismiss and for Summary Judgment. On February 3, 1989, plaintiffs filed their Response to the Motion to Dismiss as well as an amended complaint. The amended complaint added the allegation that in addition to pay disparities between departments, teachers who transferred from DOC or DOE into DMH/MR were able to keep their old higher salaries. The plaintiffs alleged that the fact that DOC and DOE teachers could transfer into DMH/MR suggested that teachers in these departments were similarly situated and also demonstrated that pay distinctions for persons working in the same department were arbitrary and not rationally based. Oral argument was heard by Magistrate Haynes on April 26, 1989. On September 29, 1989, Magistrate Haynes issued his Report and Recommendation urging the district court to dismiss the equal protection claim for lack of merit and to dismiss the plaintiffs' other claims as barred by the eleventh amendment as they were essentially claims against state officials under state law. On November 21, 1989, the findings and conclusion of the magistrate were adopted and approved and plaintiffs' equal protection claim was dismissed and the state claims were dismissed without prejudice.[1] This timely appeal followed.
 
 II.
 
 5
 An understanding of plaintiffs' complaints regarding the existing pay scheme for teachers in Tennessee requires a discussion of the various Tennessee departments in which teachers are employed and the classification system under which teachers' salaries are calculated. Before addressing the pay scheme and benefits for each relevant department of the Tennessee educational system, we note that plaintiffs make reference to a number of state-issued job classification reports for teachers in DMH/MR, DOC, DHS and DOE which list job responsibilities and qualifications for each teaching job. J.App. 174-200. Our review of these classification reports suggests that the job requirements, duties and qualifications for teachers in these job categories seem to be substantially similar across departments. Id.
 
 
 6
 A. The Tennessee Civil Service System.
 
 
 7
 The Department of Personnel ("DOP") was established in 1939. The agency is responsible for the appointment, promotion, transfer, layoff, removal and disciplinary procedures of employees within the state civil service. Tenn.Code Ann. Sec. 8-30-201(a) (1988). The chief executive officer for the DOP is its Commissioner. Tenn.Code Ann. Secs. 8-30-202(a) (1988). The Commissioner recommends to the Governor a compensation plan for all positions in the state service and administers the plan as approved by the Governor. Tenn.Code Ann. Sec. 8-30-202(6)(F) (1988).
 
 
 8
 State law requires that the compensation plan be based "as far as practicable" on prevailing wages paid in the public and private service within the state. Id. However, broad discretion is left to the commissioner and the governor in setting salaries for state service employees. Factors which may be taken into account include: "experience in recruiting for positions in the state service, the prevailing rates of pay for the services performed and for comparable services in public and private employment, living costs, maintenance of other benefits received by employees, and the state's financial condition and policies." Tenn.Code Ann. Sec. 8-30-214(a) (1988).
 
 
 9
 Civil servants are eligible for a number of benefits not applicable to other types of state employees. These benefits include merit pay, Id. at Sec. 8-30-214(b)(1); compensatory time for overtime work, Id. at Sec. 8-30-214(c); and one-step periodic salary increases for satisfactory job performance, Id. at Sec. 8-30-214(d). In addition, civil service employees enjoy job security and procedural protection in the case of dismissal afforded government employees.
 
 
 10
 B. Department of Education Special Schools.
 
 
 11
 The state system for public education is administered at the state level by the Commissioner of Education and the state board of education. Tenn.Code Ann. Sec. 49-1-102. Most public education in Tennessee is conducted by local education agencies ("LEA's") under the supervision of the commissioner and the board. Tenn.Code Ann. Sec. 49-1-103(1), Sec. 49-2-203 (1990).
 
 
 12
 Tennessee special schools, however, are under the direct supervision of the state board of education. The special schools are the Tennessee Preparatory School, the Tennessee School for the Blind, the Tennessee School for the Deaf, and the Alvin C. York Agricultural Institute. Id. at Sec. 49-50-1001(a)(1).
 
 
 13
 The state board of education selects the president, teachers, officers, and other employees for these schools and fixes their salaries and terms of office. Id. The Department of Finance and Administration prescribes the budgetary, accounting and financial reporting procedures for these schools, but the state board of education has the authority to modify the budgets within a given year. Id. at Sec. 49-50-1002(a), (b)(1).
 
 
 14
 Teachers of the special schools are not civil service employees. Their salaries are established by the Board of Education and not the Department of Personnel. Id. at Sec. 49-50-1001(1). In 1986, the General Assembly modified the civil service statutes specifically to exclude the special school teachers from the civil service laws. Tenn.Code Ann. Sec. 8-30-101(23)(H) (1988).[2]
 
 
 15
 In 1977, the Legislature mandated that the salaries for teachers in these special schools be "reasonably comparable" to those of LEA teachers where the special institution was located. Tenn.Code Ann. Sec. 49-50-1003(d) (1990). In effect, this meant a pay raise for DOE teachers.
 
 
 16
 C. Department of Correction.
 
 
 17
 The chief officer of the DOC is the Commissioner, who has authority to appoint, with the approval of the Governor, "a competent professional staff of employees." Tenn.Code Ann. Sec. 41-1-102(a) (1982). While the DOC is primarily responsible for the state penitentiary system and all state reformatories, it also has jurisdiction over several juvenile institutions. See Id. at Sec. 41-5-105(a). The management and government of state vocational training schools are specifically vested in the DOC, and it is given complete executive, administrative, and fiscal power over all such institutions, with limited exceptions. Tenn.Code Ann. Sec. 4-6-102 (1985).
 
 
 18
 In 1974, the state legislature made the penal and reformatory institutions under the control of the Commissioner of Correction a Special School District. Id. at Sec. 4-6-143(a). This newly-created school district was given the authority, powers and privileges exercised "by any other school district." Id. at Sec. 4-6-143(g).
 
 
 19
 In 1981, the legislature removed DOC teachers from the usual salary structures applicable to other career civil service employees and enacted a new compensation scheme for DOC teachers. This scheme mandated that such teachers be paid "one-tenth times twelve the annual compensation" set in the state salary schedule of the Board of Education for teachers with similar training and experience, plus any state mandated local supplement. Id. at Sec. 4-6-143(d)(1). This new compensation scheme amounted to a salary increase for most teachers working in the DOC.
 
 
 20
 The legislature modified the salaries of DOC teachers twice more by statute in 1985 and 1987. In 1985, the statutory scheme required that in addition to the 1/10 times 12 scheme, DOC teachers' salaries were to be "reasonably comparable" to those salaries currently in effect in the school system where the respective institution was located. Id. The 1987 modifications removed the "reasonably comparable" language and required instead that DOC teachers' salaries be linked to the average compensation of teachers in the county in which the institution is located or the average compensation of teachers in contiguous counties, whichever is greater. Tenn.Code Ann. Sec. 4-6-143(d)(1) (1988 Cum.Supp.). Thus, DOC teachers were given another raise.
 
 
 21
 D. The DMH/MR.
 
 
 22
 The Department of Mental Health/Mental Retardation was created in 1953 to administer and control all state mental health facilities in Tennessee and to provide care for the mentally ill and mentally retarded. Tenn.Code Ann. Sec. 4-3-1603 (1985). In furtherance of its duties, the DMH/MR was granted power to enter into contractual agreements with persons and institutions to provide treatment, training, research and education. Tenn.Code Ann. Sec. 33-1-201(a) (1984).
 
 
 23
 The Commissioner of DMH/MR has complete authority over the department including the power to recommend the employment of personnel. Id. at Sec. 33-1-203(2). However, unlike DOE teachers, teachers in DMH/MR are civil service employees. Id. at Sec. 33-2-309. DMH/MR does not have status as a special school district and it is not mandated to provide educational services. However, DMH/MR does provide education to certain individuals within its care pursuant to a 1981 interagency agreement between the DOE and DMH/MR. Interagency Agreement (Addendum 6, Defendants' Brief). The interagency agreement provides that the DOE has primary responsibility for the education of handicapped children but allows DMH/MR to provide educational services as part of its treatment and/or habilitation plan for individual patients. See Id. at 5-6.
 
 
 24
 In 1988, legislation was introduced to equate the pay of DMH/MR teachers and DHS teachers to those of local LEA teachers. Thus, the legislation would have created a salary scheme equivalent to the scheme for DOC and DOE special schools teachers. See Senate Bill 2044 (Addendum 7, Defendants' Brief). The Department of Personnel submitted its analysis of the bill and recommended that it not be passed. One of the reasons it gave was that the special pay plan created for DOC teachers had resulted in substantial pay disparities within the department, led to discord and was destructive to morale. See Bill Analysis (Addendum 8, Defendants' Brief). The same bill was introduced in 1989 and again was rejected by the legislature. See Bill (Addendum 9, Defendants' Brief).
 
 III.
 
 25
 The plaintiffs base their equal protection challenge to the Tennessee pay structure for teachers on two distinct allegations. The first, which plaintiffs designate as their "inter-class" claim, is based upon the assertion that teachers performing essentially the same functions and in positions which have essentially the same qualifications and requirements are paid different salaries under the state pay scheme depending upon the department in which they work. The second, which plaintiffs designate as their "intra-class" claim, is based upon the assertion that teachers who transfer from a higher paying department into the DMH/MR or the DHS are able to retain their higher salaries while performing the same functions as teachers hired in DMH/MR directly. Thus, plaintiffs contend that the transfer policy irrationally discriminates in pay between teachers in the same civil service class performing the same functions.
 
 
 26
 Relying on their inter-class and their intra-class allegations, plaintiffs assert that the Tennessee pay scheme is being misinterpreted or misapplied in violation of the equal protection clause because Tennessee law requires that persons in the same civil service classification performing the same functions and with the same qualifications be paid the same.
 
 
 27
 It is well established that the equal protection clause of the fourteenth amendment requires different degrees of scrutiny of state laws and actions depending upon the particular class or type of right affected. See Browder v. Tipton, 630 F.2d 1149, 1152 (6th Cir.1980). When neither a fundamental right nor a suspect class is involved, and legislation is economic or social in nature, the level of scrutiny is rational basis review.
 
 
 28
 Under the rational basis test, which is applicable to economic and social legislation not involving 'suspect' classes or impinging upon fundamental rights, '[a] statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.'
 
 
 29
 Baker v. Vanderbilt Univ., 616 F.Supp. 330, 331 (M.D.Tenn.1985) (quoting McGowan v. State of Maryland, 366 U.S. 420, 426 (1961)). A great deal of deference is afforded state legislatures in creating statutory classifications.
 
 
 30
 [T]he fourteenth amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality.
 
 
 31
 McGowan, 366 U.S. at 425-26. Even when the wisdom or judgment of the State legislature is debatable, a federal court is not free to set aside the legislature's judgment to substitute its own. Kelly v. Metropolitan Bd. of Educ. of Nashville and Davidson Cty. Tenn., 836 F.2d 986, 996 (6th Cir.1987), cert. denied, 487 U.S. 1206 (1988). State legislators may make legislative distinctions between groups without having to justify the correctness of those distinctions so long as the challenged regulations are at least debatably based on rational considerations. See In Re Grand Jury Proceedings, 810 F.2d 580, 588 (6th Cir.1987).
 
 
 32
 While plaintiffs admit that the proper standard of review in this case is rational basis review, they assert that such review does not amount to a rubber stamp for state action. See, e.g., City of Cleburne, Texas v. Cleburne Living Center, 473 U.S. 432, 435, 447-50 (1985) (zoning ordinance which had effect of excluding group homes for mentally retarded struck down under rational basis test). In essence, plaintiffs assert that their equal protection claim based upon unequal pay for equivalent work is analogous to the unequal property tax scheme struck down by the Supreme Court under rational basis review in Allegheny Pittsburgh Coal Co. v. County Comm'n, 109 S.Ct. 633 (1989).
 
 
 33
 In Allegheny, plaintiffs made reference to the West Virginia Constitution which mandated that "taxation be equal and uniform throughout the State, and all property be taxed in proportion to its value." W.Va. Const., Art. X, Sec. 1. Against this background right to fair and equal taxation, plaintiffs challenged the property assessments made by the tax assessor in Webster County by alleging that Webster County's assessment policy systematically resulted in excessive appraisals for properties recently conveyed when compared with equivalent properties which had not been recently conveyed. 109 S.Ct. at 635. The plaintiffs further alleged that they had sought relief from the unfair assessments each year for some ten years and had received no relief from Webster County. The Supreme Court held that the Webster County tax assessment scheme violated the equal protection clause of the fourteenth amendment of the United States Constitution. Id. at 637. The Court based its holding on a finding that the class of property owners in Webster County constituted a single class and that the tax assessment policy which resulted in radically different tax burdens for similarly situated property owners within the class was not rationally related to the state purpose of assessing properties in light of their current value. Id. at 637-38. Further, the Court found that since taxpayers had sought relief from the assessment system in Webster County for many years without success, Webster County could not be excused on a theory that it was equalizing its tax scheme in a step-by-step manner. Id. at 638.
 
 
 34
 While plaintiffs have not established to our satisfaction that the Tennessee constitution and laws create a right to equal pay, even if we were to assume that such a right exists under Tennessee law, plaintiffs' equal protection challenge must fail whether they rely on their inter-class or their intra-class allegations. We will take up each of these allegations separately.
 
 
 35
 A. Inter-class Claim.
 
 
 36
 In their "inter-class" claim, plaintiffs assert that the Tennessee pay scheme is irrational because it makes salary distinctions between teachers performing similar functions with similar qualifications in different departments. In response, defendants offer a number of reasons why such distinctions might have been made. For example, defendants note that while DMH/MR teachers are civil service employees, DOE teachers are not. Therefore, DOE might be given higher salaries to make up for the lack of civil service benefits.
 
 
 37
 Further, defendants argue that while DMH/MR teachers and DOC teachers are both in the civil service system, the legislature opted to pay DOC teachers through a different pay mechanism. They suggest this mechanism might be rationally based upon a determination that teaching in correctional facilities involves a certain degree of additional hardship or that recruitment of correctional facility teachers is more difficult.
 
 
 38
 Finally, defendants point to the fact that the legislature twice rejected an opportunity to equalize the pay scheme for DMH/MR and DHS teachers with the schemes in place for DOE and DOC teachers. It is well established that states need not address all legislative inequalities at once and may seek to make equalizing changes in a step-by-step fashion. In Re Grand Jury Proceedings, 810 F.2d at 588.
 
 
 39
 We find that the bases offered by the defendants to justify pay inequalities between teachers in different departments meet the rational basis test under the equal protection clause. Unlike the property owners in Allegheny, the teachers in this case are not similarly-situated members of a single class. Rather, the Tennessee pay scheme creates a number of different classes of teachers contingent upon the department in which they work. While the qualifications and duties of teachers in different departments may be similar, the Tennessee legislature has rationally determined that differences between departments merit differences in pay. As it is not our role to second-guess the legislature, even if we find the course it has chosen to be a dubious one, we find that the district court properly dismissed plaintiffs' equal protection claims based on its "inter-class" allegation.
 
 
 40
 B. The Intra-class Claim.
 
 
 41
 As to plaintiffs' "intra-class" allegation, plaintiffs assert that the fact that teachers are transferred between higher paying departments and DMH/MR suggests that teachers are performing essentially similar functions. Further, they assert that the fact that transferees are able to keep their higher salaries while doing the same functions as lower paid DMH/MR teachers suggests that the pay scheme is irrational in violation of the equal protection clause.
 
 
 42
 Plaintiffs assert that the discrimination in pay between transferees and regular DMH/MR teachers is impermissible discrimination within a single class: the class of teachers at DMH/MR. Defendants retort that transferees from other departments and non-transferees represent different classes. For their position, defendants rely on Tenn.Code Ann. Sec. 8-30-318 and Rules 1120-4-.07 and 1120-4-.08 (For Rules See J.App. 258), which provide different circumstances in which employees who change job classifications or departments may retain their prior salary, so long as that salary does not exceed the maximum salary in the department to which are they transferred. Justifications for such a scheme are easy to imagine. They include enabling the state to transfer employees more easily into job areas where they are most needed without requiring the transferee to take a pay cut, seeking to maintain loyalty of state employees, and rewarding employees for their flexibility in accepting transfers.
 
 
 43
 We find that the statute and rules which enable transferees to retain previous pay levels without raising the levels of non-tranferees create a rational distinction between the class of transferees and the class of non-transferees. As the plaintiffs make no allegation which suggests that there are pay distinctions between non-tranferee teachers in the DMH/MR or between transferee teachers in that department, plaintiffs have failed to make out an equal protection claim on the basis of their "intra-class" claim.
 
 IV.
 
 44
 Since the plaintiffs failed to state a claim under the equal protection clause of the United States Constitution, the district court was barred from hearing plaintiffs' pendant claims based upon state law by the eleventh amendment. Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 102-03 (1984) (federal courts have no jurisdiction to hear cases in which a plaintiff seeks relief against state officials for violations of state law). Thus, we find that the district court properly dismissed plaintiffs' state law claims without prejudice.
 
 
 45
 In seeking to circumvent the eleventh amendment bar to their state law claims, plaintiffs assert that 42 U.S.C. Sec. 1988 creates an independent basis for jurisdiction for their claims. Plaintiffs argue that section 1988 was enacted under Congress's power under section 5 of the fourteenth amendment and therefore removes the eleventh amendment bar to actions against state officials for equitable monetary relief. Plaintiffs rely on the Supreme Court's decision in Hutto v. Finney, 437 U.S. 678 (1978). We find plaintiffs' reliance on Hutto to be misplaced.
 
 
 46
 In Hutto, the Court held that although the eleventh amendment immunizes states from suits in federal court for retroactive monetary relief, this bar does not immunize states from prospective injunctive relief. The Court then reasoned that attorney's fees were part of the cost of compliance with prospective relief and therefore were not barred by the eleventh amendment. Id. at 691-92. However, both Hutto and Sec. 1988 are addressed to the issue of attorney's fees only and not to creating an independent basis for jurisdiction in suits otherwise barred by the eleventh amendment.
 
 
 47
 Further, Sec. 1988 only allows attorney's fees for the prevailing party in suits brought under federal civil rights laws. Thus, section 1988 may only be invoked if the plaintiff states a valid claim under another civil rights statute. As the plaintiffs have failed to state a civil rights claim in their complaint which is cognizable in federal court, their attempt to bootstrap jurisdiction by invoking Sec. 1988 must fail.
 
 V.
 
 48
 For the aforestated reasons, we AFFIRM the district court's dismissal of plaintiffs' equal protection claim and its dismissal without prejudice of plaintiffs' state law claims.
 
 
 
 [1]
 It appears that plaintiffs' complaint also alleged violations of the contracts clause and the just compensation clause, however these claims were not pursued on appeal and therefore we will assume the lower court's determination of these claims is final
 
 
 [2]
 Prior to the passage of this statute there had been some ambiguity about the eligibility of special school teachers for civil service benefits. In 1984, the State Attorney General issued an opinion concluding that these teachers were not covered by the civil service laws and were not entitled to benefits. Op.Atty.Gen., (Sept. 12, 1984). (Addendum 1 to Defendant's Brief)